UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAFAEL CUELLAR,                                    :
                                                  :
                    Plaintiff,                    :        Case No. 17-cv-1073
                                                  :
        v.                                        :
                                                  :
BAYNE MACHINE WORKS, INC., d/b/a                  :
BAYNE THINLINE, d/b/a BAYNE PREMIUM              :
LIFT SYSTEMS; EAST CHICAGO MACHINE                :
TOOL CORPORATION, d/b/a BALEMASTER;               :
ADVANCED EQUIPMENT SALES, INC., and              :
RELIABLE PAPER RECYCLING, INC.                    :
                                                  :        AMENDED COMPLAINT
                    Defendant.                    :        WITH JURY DEMAND

        AND NOW COMES FORTH Plaintiff RAFAEL CUELLAR, by and through his counsel,

WEINSTEIN, ZIMMERMAN & OHLIGER, and complains of Defendants as follows:

## I.  The Parties

        1.      Plaintiff RAFAEL CUELLAR is an adult individual, *sui juris,* with an address of 571

West 139th Street, New York, NY 10031.

        2.      Defendant BAYNE MACHINE WORKS, INC. (hereinafter "BAYNE") was and is

a South Carolina corporation with a business address at 208 Fairforest Way, Greenville, SC 29607.

        3.      At all times relevant hereto, Defendant BAYNE did and continues to do business as,

and/or was and is also known as, BAYNE THINLINE and/or BAYNE PREMIUM LIFT

SYSTEMS.

        4.      At all times relevant hereto, Defendant BAYNE did and continues to engage in the

design, manufacture, assembly, distribution, promotion, and sales of industrial machines and

equipment, including but not limited to lift systems (a/k/a "cart tippers") marketed and sold under

the "Bayne Thinline" brand.

5.    Defendant EAST CHICAGO MACHINE TOOL CORPORATION was and is an Indiana corporation with a business address at 980 Crown Court, Crown Point, Indiana 46307.

6.    At all times relevant hereto, Defendant EAST CHICAGO MACHINE TOOL CORPORATION (hereinafter "BALEMASTER") did and continues to do business as, and/or was and is known as, BALEMASTER.

7.    At all times relevant hereto, Defendant BALEMASTER did engage in the design, manufacture, assembly, distribution, promotion, and sales of industrial machines and equipment, including but not limited to balers and compactors.

8.    Defendant ADVANCED EQUIPMENT SALES, INC. (hereinafter "AES") is a Pennsylvania corporation with a business address at 535 Hagey Road, Souderton, PA 18964.

9.    At all times relevant hereto, Defendant AES did engage in the sales, supply, distribution, promotion, sales, maintenance, and repair of industrial machines and equipment, including but not limited to lift systems, balers, and compactors.

10.    Defendant RELIABLE PAPER RECYCLING, INC. (hereinafter "RELIABLE") is a New Jersey corporation with a business address at 1 Caven Point Avenue, Jersey City, NJ 07305.

11.    At all times relevant hereto, Defendant RELIABLE did engage in the collection of recyclable materials such as paper and cardboard from remote customers for the purpose of recycling those materials, and did provide industrial machines and equipment to its customers for that purpose.

II.  Statement of Jurisdiction

12.    Plaintiff CUELLAR is a citizen of the State of New York.

13.    Defendant BAYNE is a citizen of the State of South Carolina, having its corporate headquarters and "nerve center" at the aforesaid address.

14.    Defendant BAYNE does transact business within the State of New York, and contracts to otherwise conduct business within New York State, and is subject to personal

jurisdiction within the State pursuant to FRCP 4(k)(1)(A) and New York CPLR § 302.

15.    Defendant BALEMASTER is a citizen of the State of Indiana, having its corporate headquarters and "nerve center" at the aforesaid address.

16.    Defendant BALEMASTER does transact business within the State of New York, and contracts to otherwise conduct business within New York State, and is subject to personal jurisdiction within the State pursuant to FRCP 4(k)(1)(A) and New York CPLR § 302.

17.    Defendant AES is a citizen of the Commonwealth of Pennsylvania, having its corporate headquarters and "nerve center" at the aforesaid address.

18.    Defendant AES does transact business within the State of New York, and contracts to otherwise conduct business within New York State, and is subject to personal jurisdiction within the State pursuant to FRCP 4(k)(1)(A) and New York CPLR § 302.

19.    Defendant RELIABLE is a citizen of the State of New Jersey, having its corporate headquarters and "nerve center" at the aforesaid address.

20.    Defendant RELIABLE does transact business within the State of New York, and contracts to otherwise conduct business within New York State, and is subject to personal jurisdiction within the State pursuant to FRCP 4(k)(1)(A) and New York CPLR § 302.

21.    The amount in controversy in this matter exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

22.    This Court has subject matter jurisdiction in this case based upon diversity of citizenship, pursuant to 28 U.S.C. § 1332.

### III.  Statement of Claim

23.    Defendant BAYNE designed, manufactured, marketed, and sold a lift system (a/k/a "cart tipper") identified as "Bayne Thinline P/N 1920-5072, Serial Number SO-612".

24.    Defendant BALEMASTER designed, manufactured, marketed, and sold a baler identified as "Balemaster Model Number 1772-AO, Serial Number 123316".

25.    The subject lift system and baler were both purchased and, at all times relevant hereto, owned by Defendant RELIABLE.

26.    Defendant AES sold, distributed, installed, and periodically repaired, serviced, and maintained the subject lift system and baler.

27.    Defendant RELIABLE leased/loaned, distributed, installed, and periodically repaired, serviced, and maintained the subject lift system and baler, which at all times relevant hereto were located and operated at North American Packaging, LLC d/b/a Econo-Pak (hereinafter "Econo-Pak) in Milford, Pennsylvania.

28.    On or about July 30, 2015, Plaintiff was employed by Econo-Pak

29.    On or about July 30, 2015, pursuant to and in furtherance of his employment, Plaintiff did use the subject lift system to lift containers of waste and dump them into the subject baler.

30.    While operating the subject lift system using its hand-held, wired control, Plaintiff raised the hydraulic lift to dump a container into the subject baler.

31.    While the subject lifter was in an upright position, and with the hand-held control in his left hand, Plaintiff reached with his right arm to retrieve a piece of plastic from the baler.

32.    In reaching for the plastic, Plaintiff's right hand became situated between the 'bucket' of the lift system and the 'sill' or 'opening' of the baler.

33.    While reaching for the plastic, Plaintiff inadvertently activated the hydraulic lift with the hand-held control, crushing his right hand between the aforesaid parts of the lift system and baler.

34.    Prior to Plaintiff's injury, the subject lift system and baler were purchased by Defendant RELIABLE and delivered at its direction to the Econo-Pak facility in Milford, Pennsylvania.

35.     Prior to Plaintiff's injury, Defendant RELIABLE, in collaboration with Defendant AES, did select and design a cardboard disposal system for use at Econo-Pak comprised of the subject baler and subject lift system, and did attempt to order machines with appropriate dimensions relative to each other such that the lift system would effectively and successfully dump waste cardboard into the baler.

36.     In its attempt to order compatible machines, Defendants RELIABLE and/or AES did specify to Defendant BALEMASTER that it would be necessary to deliver the subject baler without a hopper, as the hopper increased the height of the baler's opening above the height of the subject lift system.

37.     In place of the hopper, it was the intent of Defendants RELIABLE and/or AES to fabricate a custom, three-sided enclosure into which the lift system bucket would dump.

38.     Prior to Plaintiff's injury, the subject baler was delivered to Defendant RELIABLE at the Econo-Pak facility in a manner which did not meet specifications in that it included the aforesaid hopper.

39.     As the product of consultation between Defendants RELIABLE, AES, and BAYNE, a decision was made to modify the baler hopper by cutting away the front panel, making the opening low enough for the subject lift system to dump into.

40.     Upon information and belief, the aforesaid modification was made with the knowledge and/or consent of Defendant BALEMASTER.

41.     The baler's hopper was so modified, and the two machines were mated to one another.

42.     The result was that a custom, three-sided enclosure was not constructed on the subject baler.

43.     The result of this modification, and of the failure to construct a custom enclosure, was that the point where the lift system's 'bucket' met the 'sill' or 'mouth' of the baler during operation created an unguarded pinch point within the reach of the operator from a foreseeable point of operation.

<u>COUNT I – Strict Products Liability</u>

<u>RAFAEL CUELLAR v. BAYNE MACHINE WORKS, INC.</u>

44.     Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint, by reference, as if more fully set forth herein.

45.     Defendant BAYNE, acting by and through their duly authorized agents, servants, and employees, are strictly liable to Plaintiff for his injuries resulting from his use of the subject lift system, which was dangerous, defective, and not reasonably safe.

46.     The subject lift system was dangerous, defective, and not reasonably safe because the lift system, as designed, manufactured, sold, and delivered:

    a.    includes a dangerous, unguarded opening in its frame which exposes a pinch point when mated with a baler or compactor, with said pinch point being created by movement of the various parts and components of the lifter relative to the stationary baler/compactor;

    b.    includes the aforesaid unguarded opening and resulting pinch point near an intended point of operation of the machine and within reach of the operator from that position;

    c.    includes the aforesaid unguarded opening and resulting pinch point near a reasonably foreseeable point of operation of the machine and within reach of the operator from that position;

    d.    includes controls by which the lift mechanism could be operated by a single operator while that operator was not safely positioned at those controls (*to*

*wit*, a corded control that allows the operator to move into dangerous positions while operating the lifter), and also allows the operator to unsafely 'jog' the lift mechanism to shake out materials;

e.  lacks pressure plates, foot controls, sensors, and/or other devices capable of identifying an operator's presence in an unsafe position or location, or that operator's absence in a safe position or location, capable of immediately and automatically shutting down the machine in the event of a dangerous operating condition;

f.  is not reasonably safe given its intended purpose, its reasonably foreseeable uses, reasonably foreseeable positions of the operator, and reasonably foreseeable motions, movements, and actions of the operator;

g.  is not complaint with OSHA regulations and generally accepted standards for industrial safety;

h.  must be modified in order to render its operation compliant with OSHA regulations and generally accepted standards for industrial safety, such modifications include but are not limited to fabricating and adding guards, rewiring the control panel to operate as a two-handed control, and/or adding safety stop switches, buttons, and other devices described above;

i.  is otherwise defective and not reasonably safe;

j.  lacks proper and effective instructions and/or written and/or visual warnings to users regarding safe use of the lift system, what activities constitute unsafe use of the subject lift system, and the risk of injury attendant to such unsafe but otherwise reasonably foreseeable operations;

k.  lacks accompanying training programs, videos, and/or written materials necessary to properly instruct and train an operator in the safe use of the

subject lift system;

l.     does not include, supply, and/or recommend the use of push sticks and other tools for handling and controlling material being lifted by the subject lift system; and

m.    does not advise the operator against, and/or properly and effectively warn the operator of, the risk of injury attendant to manually handling materials being lifted by the lift system while its parts are in motion.

47.     Because the subject lift system was not reasonably safe by its design, Defendant BAYNE is strictly liable to Plaintiff for his injuries.

48.     The subject lift system and its component parts were in a defective condition at the time they left the possession and control of Defendant BAYNE, and were not substantially changed prior to the time of Plaintiff's injury.

49.     The design, manufacture, assembly, distribution, promotion, and sales of the subject lift system in a dangerous and defective condition caused Plaintiff's injuries.

50.     A feasible alternative design(s) for the lift system exists, and did exist at the time when it was manufactured and sold to Defendant RELIABLE.

51.     The alternative design(s), if employed by Defendant BAYNE, would have rendered the lift system reasonably safe and would have prevented the injuries sustained by Plaintiff.

52.     Defendant BAYNE is strictly liable to the Plaintiff pursuant to Restatement (Second) of Torts § 402A.

53.     As a result of the aforesaid accident, Plaintiff suffered grievous and severe bodily injuries, and his damages include but are not limited to:

a.     Injuries to his right hand, including but not limited to right index and middle finger open fractures with tendon injuries;

b.     Past, present, and future pain and suffering;

c.     Past, present, and future mental anguish, emotional distress, inconvenience, and discomfort;

d.     Past, present, and future impairment and loss of the use of his right hand in his vocation;

e.     Past, present, and future impairment and loss of the use of his right hand in performing various activities of daily living;

f.     Past, present, and future embarrassment and humiliation;

g.     Past, present, and future bodily disfigurement;

h.     Past, present, and future medical expenses;

i.     Past, present, and future loss of wages and loss of earning capacity; and

j.     Past, present, and future deprivation and loss of life's pleasures.


## COUNT II – Negligence

## RAFAEL CUELLAR v. BAYNE MACHINE WORKS, INC.

54.     Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint, by reference, as if more fully set forth herein.

55.     Defendant BAYNE was negligent in failing to exercise reasonable care in the design, testing, manufacture, assembly, distribution, promotion, sale, and delivery of the subject lift system and its component parts, and by failing to include proper warnings, notice, or instructions to users and consumers about the dangers, risks, and hazards attendant to use of the subject lift system.

56.  The carelessness and negligence of Defendant BAYNE included, but was not limited to, the following acts and/or omissions:

a.     including in the design of the subject lift system a dangerous, unguarded opening in its frame which creates an exposed pinch point when mated with a baler or compactor, posing an appreciable risk of harm to the operator;

b.    failing, in the design of the subject lift system, to guard the aforesaid
opening, or to locate it out of reach of the operator while positioned in the
intended and/or reasonably foreseeable points of operation;

c.    failing, in the design of the subject lift system, to include controls which were
positioned and operated in such a manner as to ensure the safety of the
operator (*to wit*, including a corded control that allows the operator to move
into dangerous positions while operating the lifter), and which do not allow
an operator to unsafely 'jog' the lift mechanism to shake out materials;

d.    failing, in the design of the subject lift system, to include pressure plates,
sensors, and other devices capable of identifying an operator's presence in an
unsafe position or location, or absence in a safe position or location;

e.    manufacturing, distributing, selling, and/or delivering the subject lift system
despite the fact that it knew or should have known that the lift system, as
designed, included a dangerous, unguarded opening which creates an
exposed pinch point when mated with a baler or compactor, posing an
appreciable risk of harm to operators;

f.    manufacturing, distributing, selling, and/or delivering the subject lift system
despite the fact that it knew or should have known that the intended and/or
reasonably foreseeable points of operation were within reach of the aforesaid
dangerous, unguarded opening which exposes a pinch point when mated
with a baler or compactor;

g.    manufacturing, distributing, selling, and/or delivering the subject lift system
despite the fact that it knew or should have known that it lacked pressure
plates, sensors, and other devices capable of identifying an operator's

presence in an unsafe position or location, or absence in a safe position or location;

h.    manufacturing, distributing, selling, and/or delivering the subject lift system despite the fact that it knew or should have known that it could not be operated, as delivered, in compliance with OSHA regulations and generally accepted standards for industrial safety;

i.    manufacturing, distributing, selling, and/or delivering the subject lift system despite the fact that it knew or should have known that it would have to be modified in order to render its operation compliant with OSHA regulations and generally accepted standards for industrial safety, including but not limited to fabricating and adding guards, rewiring the control panel to operate as a two-handed control, and/or adding safety stop switches, buttons, and other devices described above;

j.    manufacturing, distributing, selling, and/or delivering the subject lift system despite the fact that it knew or should have known that it was defective and not reasonably safe;

k.    manufacturing, distributing, selling, and/or delivering the subject lift system despite the fact that it knew or should have known that it lacked proper and effective instructions and/or written and/or visual warnings to users regarding safe use of the lift system, what activities constitute unsafe use of the lift system, and the risk of injury attendant to such unsafe but otherwise reasonably foreseeable operations;

l.    manufacturing, distributing, selling, and/or delivering the subject lift system despite the fact that it lacked accompanying training programs, videos,

and/or written materials necessary to properly instruct and train an operator in the safe use of the lift system;

m.     manufacturing, distributing, selling, and/or delivering the subject lift system despite the fact that it knew or should have known that does not include, supply, and/or recommend the use of push sticks and other tools for handling and controlling material being lifted by the lift system;

n.     manufacturing, distributing, selling, and/or delivering the subject lift system despite the fact that it knew or should have known that it does not advise the operator against, and/or properly and effectively warn the operator of the risk of injury attendant to, manually handling materials being lifted by the lift system while its parts are in motion;

o.     failing to property train, supervise, and/or manage its employees, agents, and/or contractors to ensure that their knowledge of applicable safety standards and design principles was current;

p.     failing to property train, supervise, and/or manage its employees, agents, and/or contractors to ensure that the subject lift system was designed and manufactured in a reasonably safe and non-defective manner;

q.     failing to properly and adequately study and test the design of the subject lift system to determine whether it could be operated in a reasonably safe manner as designed, and especially when mated with a baler or compactor;

r.     failing to property and adequately study and test the design of the subject lift system to determine whether it included sufficient safety systems and devices;

s.  failing to properly and adequately study, develop, design, and consider feasible alternative designs for safety systems and devices on the subject lift system;

t.  failing to properly and adequately collect and track customer complaints regarding operation of this and other lift systems manufactured by Defendant, and to use same as feedback in the study, development, design, and consideration of feasible alternative designs for safety systems and devices on the subject lift system;

u.  failing to properly and adequately collect and track incidents involving malfunction, personal injury, property damage, and/or other hazardous and harmful events resulting from use and operation of this and other lift systems manufactured by Defendant, and to use same as feedback in the study, development, design, and consideration of feasible alternative designs for safety systems and devices on the subject lift system;

v.  suggesting, encouraging, and/or endorsing a dangerous modification to the subject baler manufactured by Defendant BALEMASTER in order to mate the two machines, when it knew or should have known that the subject baler was delivered in a manner which did not meet specifications and rendered the two machines incompatible;

w.  having so suggested, encouraged, and/or endorsed such a modification, failing to then follow up by requesting photographs, measurements, an 'as built' schematic, or other similar documents or materials for the purpose of ensuring that the two machines were properly mated and that any resulting pinch points were safely guarded;

x.    selling a lift system to Defendant RELIABLE, despite the fact that it knew or should have known that such lift system would be used in an application for which it was not suited (*i.e.,* that it would be mated with a baler that was not of compatible dimensions); and

y.    selling a lift system to Defendant RELIABLE, despite the fact that it knew or should have known that such lift system would be used in a specific application, without ensuring its suitability for that purpose and compatibility with the specific baler used.

57.    As a direct result of the negligence of Defendant BAYNE as aforesaid, and by Defendant's otherwise negligent and careless acts and/or omissions, Plaintiff was caused to suffer severe bodily injuries and damages set forth herein.

COUNT III – Breach of Warranties

RAFAEL CUELLAR v. BAYNE MACHINE WORKS, INC.

58.    Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint by reference, as if more fully set forth herein.

59.    Defendant BAYNE expressly and impliedly warranted that the lift system and its component parts were of merchantable quality and were fit for the purpose and use for which they were intended and could be utilized by the Plaintiff without substantial risk of injury.

60.    Said warranties were relied upon by Defendant RELIABLE in purchasing the lift system.

61.    By reason of their defective condition, the lift system and its component parts were not fit for their intended use, nor were of merchantable quality.

62.    The defects existed at the time of distribution and sale of the subject lift system.

63.    Defendants breached said warranties by distributing and selling a defective and dangerous product that was unmerchantable and unfit for the ordinary purpose for which it was intended.

64.    Defendants' breach of warranties caused the injuries and damages to Plaintiff, RAFAEL CUELLAR, as set forth above.

## COUNT IV – Strict Products Liability

## RAFAEL CUELLAR v. EAST CHICAGO MACHINE TOOL CORP. ("BALEMASTER")

65.    Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint, by reference, as if more fully set forth herein.

66.    Defendant BALEMASTER, acting by and through their duly authorized agents, servants, and employees, is strictly liable to Plaintiff for his injuries resulting from his use of the aforesaid lift system in conjunction with the subject baler, which was dangerous, defective, and not reasonably safe.

67.    The subject baler was dangerous, defective, and not reasonably safe because the baler, as designed, manufactured, sold, and delivered:

   a.    did not include a compatible lift system that was integrated into its design, or capable of being readily and safely integrated into its design;

   b.    did not include recommendations for compatible lift systems from other manufacturers that could be readily and safely integrated into its design, or discourage the use of lift systems which were incompatible;

   c.    when used with the subject lift system, use of which was not discouraged or warned against, created a dangerous, unguarded, and exposed pinch point created by movement of the various parts and components of the lifter relative to the stationary baler/compactor;

d.    when used with the subject lift system, use of which is not discouraged or warned against, includes the aforesaid unguarded pinch point near an intended point of operation of the machine and within reach of the operator from that position;

e.    when used with the subject lift system, use of which is not discouraged or warned against, includes the aforesaid unguarded pinch point near a reasonably foreseeable point of operation of the machine and within reach of the operator from that position;

f.    is not reasonably safe given its intended purpose, its reasonably foreseeable uses, reasonably foreseeable positions of the operator, and reasonably foreseeable motions, movements, and actions of the operator;

g.    is not complaint with OSHA regulations and generally accepted standards for industrial safety;

h.    must be modified in order to render its operation compliant with OSHA regulations and generally accepted standards for industrial safety, such modifications include but are not limited to fabricating and adding guards to protect the operator from a dangerous, unguarded pinch point created by mating the baler with an incompatible or incorrectly mated lift system;

i.    is otherwise defective and not reasonably safe;

j.    lacks proper and effective instructions and/or written and/or visual warnings to users regarding safe use of the baler in conjunction with a compatible lift system, what activities constitute unsafe use, and the risk of injury attendant to such unsafe but otherwise reasonably foreseeable operations;

k.    lacks accompanying training programs, videos, and/or written materials necessary to properly instruct and train an operator in the safe use of the subject baler in conjunction with a compatible lift system;

l.    does not include, supply, and/or recommend the use of push sticks and other tools for handling and controlling material being loaded into the baler; and

m.    does not advise the operator against, and/or properly and effectively warn the operator of the risk of injury attendant to, manually handling materials being loaded into the subject baler.

68.    Because the subject baler was not reasonably safe by its design, Defendant BALEMASTER is strictly liable to Plaintiff for his injuries.

69.    The subject baler and its component parts were in a defective condition at the time they left the possession and control of Defendant BALEMASTER, and were not substantially changed prior to the time of Plaintiff's injury.

70.    The design, manufacture, assembly, distribution, promotion, and sales of the subject baler in a dangerous and defective condition caused Plaintiff's injuries.

71.    A feasible alternative design(s) for the subject baler exists, and did exist at the time when it was manufactured and sold to Defendant RELIABLE.

72.    The alternative design(s), if employed by Defendant BALEMASTER, would have rendered the baler reasonably safe and would have prevented the injuries sustained by Plaintiff.

73.    Defendant BALEMASTER is strictly liable to the Plaintiff pursuant to Restatement (Second) of Torts § 402A.

74.    As a direct result of the aforesaid accident, and by Defendant's otherwise negligent and careless acts and/or omissions, Plaintiff was caused to suffer severe bodily injuries and damages set forth herein.

COUNT V – Negligence

RAFAEL CUELLAR v. EAST CHICAGO MACHINE TOOL CORP. ("BALEMASTER")

75.    Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint, by reference, as if more fully set forth herein.

76.    Defendant BALEMASTER was negligent in failing to exercise reasonable care in the design, testing, manufacture, assembly, distribution, promotion, sale, and delivery of the subject baler and its component parts, and by failing to include proper warnings, notice, or instructions to users and consumers about the dangers, risks, and hazards attendant to use of the subject baler.

77. The carelessness and negligence of Defendant BALEMASTER included, but was not limited to, the following acts and/or omissions:

      a.    failing to include a lift system integrated into its design, or which could have readily and safely been integrated into its design, despite the fact that it knew or should have known that attempting to mate the baler with incompatible or incorrectly mated lift systems would pose an appreciable risk of harm to the operator;

      b.    failing to include recommendations for compatible lift systems from other manufacturers that could be readily and safely integrated into its design, or discourage the use of lift systems which were incompatible;

      c.    failing to properly consider in its design that use with the subject lift system, use of which was not discouraged or warned against, creates a dangerous, unguarded, and exposed pinch point caused by movement of the various parts and components of the lifter relative to the stationary baler/compactor;

      d.    failing to property consider in its design that use with the subject lift system, use of which is not discouraged or warned against, creates the aforesaid

unguarded pinch point near an intended point of operation of the machine and within reach of the operator from that position;

e.    failing to properly consider in its design that use with the subject lift system, use of which is not discouraged or warned against, creates the aforesaid unguarded pinch point near a reasonably foreseeable point of operation of the machine and within reach of the operator from that position;

f.    failing, in the design of the subject baler, to sufficiently guard the area where a lift system will foreseeably be mated to the baler, or to locate the opening of the baler out of reach of the operator while positioned in the intended and/or reasonably foreseeable points of operation;

g.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it knew or should have known that the baler, as designed, would foreseeably be mated to a lift system that would result in exposure of a dangerous, unguarded pinch point that poses an appreciable risk of harm to operators;

h.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it knew or should have known that it could not be operated, as delivered, in compliance with OSHA regulations and generally accepted standards for industrial safety;

i.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it knew or should have known that it would have to be modified in order to render its operation compliant with OSHA regulations and generally accepted standards for industrial safety, including but not limited to fabricating and adding guards;

j.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it knew or should have known that it was defective and not reasonably safe;

k.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it knew or should have known that it lacked proper and effective instructions and/or written and/or visual warnings to users regarding safe use of the lift system, what activities constitute unsafe use of the lift system, and the risk of injury attendant to such unsafe but otherwise reasonably foreseeable operations;

l.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it lacked accompanying training programs, videos, and/or written materials necessary to properly instruct and train an operator in the safe use of the lift system;

m.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it knew or should have known that it does not include, supply, and/or recommend the use of push sticks and other tools for handling and controlling material being loaded into the baler;

n.    manufacturing, distributing, selling, and/or delivering the subject baler despite the fact that it knew or should have known that it does not advise the operator against, and/or properly and effectively warn the operator of the risk of injury attendant to, manually handling materials being loaded into the baler;

o.    failing to property train, supervise, and/or manage its employees, agents, and/or contractors to ensure that their knowledge of applicable safety standards and design principles was current;

p.    failing to property train, supervise, and/or manage its employees, agents, and/or contractors to ensure that the subject baler was designed and manufactured in a reasonably safe and non-defective manner;

q.    failing to properly and adequately study and test the design of the subject baler to determine whether it could be operated in a reasonably safe manner as designed, and especially when foreseeably mated with a lift system;

r.    failing to property and adequately study and test the design of the subject baler to determine whether it included sufficient safety systems and devices;

s.    failing to properly and adequately study, develop, design, and consider feasible alternative designs for safety systems and devices on the subject baler;

t.    failing to properly and adequately collect and track customer complaints regarding operation of this and other lift systems manufactured by Defendant, and to use same as feedback in the study, development, design, and consideration of feasible alternative designs for safety systems and devices on the subject baler;

u.    failing to properly and adequately collect and track incidents involving malfunction, personal injury, property damage, and/or other hazardous and harmful events resulting from use and operation of this and other balers manufactured by Defendant, and to use same as feedback in the study, development, design, and consideration of feasible alternative designs for safety systems and devices on the subject baler;

v.    negligently manufacturing and delivering the subject baler in a condition materially different from the specifications requested by the purchaser, *to wit,*

including a hopper which it knew or should have known would render the

baler incompatible (or more incompatible) with the subject lift system;

w.  negligently manufacturing and delivering the subject baler in a condition

materially different from the specifications requested by the purchaser, *to wit*,

including a hopper which it knew or should have known would necessitate

modification in order to render it compatible with the subject lift system;

x.  suggesting, encouraging, endorsing, or otherwise having knowledge of a

dangerous modification to the subject baler in order to mate the two

machines, when it knew or should have known that the subject baler was

delivered in a manner which did not meet specifications and rendered the

two machines incompatible;

y.  failing to correct the aforesaid error by properly removing or replacing the

hopper in a manner which it deemed sufficiently safe and appropriate given

its knowledge of the type of lift system to be used.

z.  having so suggested, encouraged, endorsed, or otherwise having knowledge

of such a modification, failing to then follow up by requesting photographs,

measurements, an 'as built' schematic, or other similar documents or

materials for the purpose of ensuring that the two machines were properly

mated and that any resulting pinch points were safely guarded;

aa.  selling a baler to Defendant RELIABLE, despite the fact that it knew or

should have known that such lift system would be used in an application for

which it was not suited (*i.e.,* that it would be mated with a baler that was not

of compatible dimensions); and

bb.  selling a baler to Defendant RELIABLE, despite the fact that it knew or

should have known that such baler would be used in a specific application,

without ensuring its suitability for that purpose and compatibility with the specific lift system used.

## COUNT VI – Breach of Warranties

### RAFAEL CUELLAR v. EAST CHICAGO MACHINE TOOL CORP. ("BALEMASTER")

78.     Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint by reference, as if more fully set forth herein.

79.     Defendant BALEMASTER expressly and impliedly warranted that the subject baler and its component parts were of merchantable quality and were fit for the purpose and use for which they were intended and could be utilized by the Plaintiff without substantial risk of injury.

80.     Said warranties were relied upon by Defendant RELIABLE in purchasing the baler.

81.     By reason of their defective condition, the baler and its component parts were not fit for their intended use, nor were of merchantable quality.

82.     The defects existed at the time of distribution and sale of the subject baler.

83.     Defendants breached said warranties by distributing and selling a defective and dangerous product that was unmerchantable and unfit for the ordinary purpose for which it was intended.

84.     Defendants' breach of warranties caused the injuries and damages to Plaintiff, RAFAEL CUELLAR, as set forth above.

## COUNT VII – Negligence

### RAFAEL CUELLAR v. ADVANCED EQUIPMENT SALES, INC.

85.     Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint, by reference, as if more fully set forth herein.

86.     Defendant AES was negligent in failing to exercise reasonable care in the design, testing, assembly, distribution, promotion, sale, and delivery of the cardboard disposal system (comprised of the subject baler and lift system), and their component parts, and by failing to include proper warnings, notice, or instructions to users and consumers about the dangers, risks, and hazards attendant to use of the subject machines.

87.   The carelessness and negligence of Defendant AES included, but was not limited to, the following acts and/or omissions:

    a.    failing to properly consider the compatibility or incompatibility of the subject baler and lift system in designing a cardboard disposal system for Econo-Pak;

    b.    failing to properly consider what safety devices and measures would be necessary to incorporate in order to ensure that the aforesaid baler and lift system could be used together safely;

    c.    failing to properly supervise the delivery and installation fo the subject baler and lift system to ensure that the final result of mating the two machines was safe and effective;

    d.    failing to observe the final result of mating the two machines in order to determine whether additional guarding or other modifications were necessary to ensure safe operation;

    e.    failing to properly research and/or implement knowledge regarding the compatibility of the subject baler and lift system;

    f.    failing to properly consider in its design and sale of the cardboard disposal system for Econo-Pak that mating the subject lift system with the subject baler created a dangerous, unguarded, and exposed pinch point caused by movement of the various parts and components of the lifter relative to the stationary baler/compactor;

g.    failing to properly consider in its design and sale of the cardboard disposal system for Econo-Pak that mating the subject lift system with the subject baler created a dangerous, unguarded, and exposed pinch point near an intended point of operation of the machine and within reach of the operator from that position;

h.    failing to properly consider in its design and sale of the cardboard disposal system for Econo-Pak that mating the subject lift system with the subject baler created a dangerous, unguarded, and exposed pinch point near a reasonably foreseeable point of operation of the machine and within reach of the operator from that position;

i.    failing to properly consider in its design and sale of the cardboard disposal system for Econo-Pak that the end result of mating the two subject machines was not in compliance with OSHA regulations and generally accepted standards for industrial safety;

j.    failing to properly consider in its design and sale of the cardboard disposal system for Econo-Pak that the two subject machines would have to be further modified in order to render their operation compliant with OSHA regulations and generally accepted standards for industrial safety, including but not limited to fabricating and adding guards;

k.    failing to oversee the proper training of Econo-Pak personnel to ensure their safe use of the cardboard disposal system which it designed and sold;

l.    failing to specifically advise operators of the cardboard disposal system which it designed and sold of the risk of injury attendant to manually handling materials being lifted by the lift system while its parts are in motion;

m.    failing to property train, supervise, and/or manage its employees, agents, and/or contractors to ensure that their knowledge of applicable safety standards and design principles was current;

n.    failing to property train, supervise, and/or manage its employees, agents, and/or contractors to ensure that the cardboard disposal system which it designed and sold was in a reasonably safe and non-defective manner;

o.    failing to properly and adequately study and test the design of the cardboard disposal system which it designed and sold to determine whether it could be operated in a reasonably safe manner as designed;

p.    failing to property and adequately study and test the design of the subject cardboard disposal system which it designed and sold to determine whether it included sufficient safety systems and devices;

q.    failing to properly and adequately study, develop, design, and consider feasible alternative designs for safety systems and devices on the subject cardboard disposal system which it designed and sold;

r.    upon receipt of the baler in a condition materially different from the specifications requested, failing to ensure that the unit was returned to, or properly modified by, the manufacturer.

s.    upon receipt of the baler in a condition materially different from the specifications requested, suggesting, encouraging, endorsing, or otherwise having knowledge of a dangerous modification to the subject baler in order to mate the two machines, when it knew or should have known that the condition of the subject baler rendered the two machines incompatible;

t.    upon receipt of the baler in a condition materially different from the specifications requested, modifying the baler while failing to properly construct guards or other safety devices;

u.    upon receipt of the baler in a condition materially different from the specifications requested, failing to return the subject lift system in exchange for one with a higher dump height;

v.    selling the cardboard disposal system which it designed to Defendant Reliable, despite the fact that it knew or should have known that such lift system would be used in an application for which it was not suited (*i.e.,* that it would be mated with a baler that was not of compatible dimensions); and

w.    selling the cardboard disposal system which it designed to Defendant Reliable, despite the fact that it knew or should have known that such baler would be used in a specific application, without ensuring its suitability for that purpose and compatibility with the specific lift system used;

x.    failing to employ personnel sufficiently qualified in safety, human factors, and ergonomics to assist in its design of cardboard disposal systems and the mating of balers with lift systems in a manner that is safe for the operator.

<u>COUNT VIII – Negligence</u>

<u>RAFAEL CUELLAR v. RELIABLE PAPER RECYCLING, INC.</u>

88.    Plaintiff hereby incorporates the foregoing paragraphs of this Amended Complaint, by reference, as if more fully set forth herein.

89.    Defendant RELIABLE was negligent in failing to exercise reasonable care in the design, testing, assembly, ownership, leasing, and/or lending of the cardboard disposal system (comprised of the subject baler and lift system), and their component parts, and by failing to include

proper warnings, notice, or instructions to users and consumers about the dangers, risks, and hazards attendant to use of the subject machines.

90.     The carelessness and negligence of Defendant RELIABLE included, but was not limited to, the following acts and/or omissions:

a.      failing to properly consider the compatibility or incompatibility of the subject baler and lift system in designing and leasing/loaning a cardboard disposal system for Econo-Pak;

b.      failing to properly consider what safety devices and measures would be necessary to incorporate in order to ensure that the aforesaid baler and lift system could be used together safely;

c.      failing to properly supervise the delivery and installation fo the subject baler and lift system to ensure that the final result of mating the two machines was safe and effective;

d.      failing to observe the final result of mating the two machines in order to determine whether additional guarding or other modifications were necessary to ensure safe operation;

e.      failing to properly research and/or implement knowledge regarding the compatibility of the subject baler and lift system;

f.      failing to properly consider in its design and leasing/loaning of the cardboard disposal system for Econo-Pak that mating the subject lift system with the subject baler created a dangerous, unguarded, and exposed pinch point caused by movement of the various parts and components of the lifter relative to the stationary baler/compactor;

g.      failing to properly consider in its design and leasing/loaning of the cardboard disposal system for Econo-Pak that mating the subject lift system with the

subject baler created a dangerous, unguarded, and exposed pinch point near an intended point of operation of the machine and within reach of the operator from that position;

h.      failing to properly consider in its design and and leasing/loaning of the cardboard disposal system for Econo-Pak that mating the subject lift system with the subject baler created a dangerous, unguarded, and exposed pinch point near a reasonably foreseeable point of operation of the machine and within reach of the operator from that position;

i.      failing to properly consider in its design and and leasing/loaning of the cardboard disposal system for Econo-Pak that the end result of mating the two subject machines was not in compliance with OSHA regulations and generally accepted standards for industrial safety;

j.      failing to properly consider in its design and and leasing/loaning of the cardboard disposal system for Econo-Pak that the two subject machines would have to be further modified in order to render their operation compliant with OSHA regulations and generally accepted standards for industrial safety, including but not limited to fabricating and adding guards;

k.      failing to oversee the proper training of Econo-Pak personnel to ensure their safe use of the cardboard disposal system which it designed and sold;

l.      failing to specifically advise operators of the cardboard disposal system which it designed and leased/loaned of the risk of injury attendant to manually handling materials being lifted by the lift system while its parts are in motion;

m.      failing to properly train, supervise, and/or manage its employees, agents, and/or contractors to ensure that their knowledge of applicable safety standards and design principles was current;

n.    failing to property train, supervise, and/or manage its employees, agents, and/or contractors to ensure that the cardboard disposal system which it designed and leased/loaned was in a reasonably safe and non-defective manner;

o.    failing to properly and adequately study and test the design of the cardboard disposal system which it designed and leased/loaned to determine whether it could be operated in a reasonably safe manner as designed;

p.    failing to property and adequately study and test the design of the subject cardboard disposal system which it designed and leased/loaned to determine whether it included sufficient safety systems and devices;

q.    failing to properly and adequately study, develop, design, and consider feasible alternative designs for safety systems and devices on the subject cardboard disposal system which it designed and leased/loaned;

r.    upon receipt of the baler in a condition materially different from the specifications requested, failing to ensure that the unit was returned to, or properly modified by, the manufacturer.

s.    upon receipt of the baler in a condition materially different from the specifications requested, suggesting, encouraging, endorsing, and performing a dangerous modification to the subject baler in order to mate the two machines, when it knew or should have known that the condition of the subject baler rendered the two machines incompatible;

t.    upon receipt of the baler in a condition materially different from the specifications requested, modifying the baler while failing to properly construct guards or other safety devices;

u.    upon receipt of the baler in a condition materially different from the specifications requested, failing to return the subject lift system in exchange for one with a higher dump height;

v.    leasing/loaning the cardboard disposal system which it designed to Defendant Reliable, despite the fact that it knew or should have known that such lift system would be used in an application for which it was not suited (*i.e.*, that it would be mated with a baler that was not of compatible dimensions); and

w.    leasing/loaning the cardboard disposal system which it designed to Defendant Reliable, despite the fact that it knew or should have known that such baler would be used in a specific application, without ensuring its suitability for that purpose and compatibility with the specific lift system used;

x.    failing to employ personnel sufficiently qualified in safety, human factors, and ergonomics to assist in its design of cardboard disposal systems and the mating of balers with lift systems in a manner that is safe for the operator.

WHEREFORE, Plaintiff Rafael Cuellar requests judgment against Defendants, jointly and/or severally as follows, with monetary amounts in excess of seventy-five thousand dollars ($75,000.00), compensatory damages equal to the amount of the claim along with interest, costs, and all other relief deemed just and proper by the Court.

Respectfully Submitted,

WEINSTEIN, ZIMMERMAN & OHLIGER

Jason R. Ohliger, Esquire
Pennsylvania ID # 201240
410 Broad Street
Milford, Pennsylvania 18337
(570) 296-7300
(570) 296-8600 (fax)
ohliger@wzlawfirm.com
Attorney for Plaintiff